UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
JONATHAN LANDOW,

                              Plaintiff,

            -against-                                    12-CV-3277 (SJF)(AKT)

WACHOVIA SECURITIES, LLC, WELLS FARGO          ORDER
ADVISORS, LLC, ROBERT WILLIAM EDDY,            **FILED**
GEORGE M. GORDON III, WALTER R.                IN CLERK'S OFFICE
ANDERSON and WALTER RANDOLPH                    U S  DISTRICT COURT E D N Y
ANDERSON, JR.,
                                                ★   AUG 1 2 2013   ★
                              Defendants.        **LONG ISLAND OFFICE**
--------------------------------------------------------------------X
FEUERSTEIN, District Judge:

            On June 29, 2012, plaintiff Jonathan Landow ("plaintiff") commenced this action against

defendants Wachovia Securities, LLC ("Wachovia"), Wells Fargo Advisors, LLC ("Wells

Fargo"), Robert William Eddy ("Eddy"), George M. Gordon III ("Gordon"), Walter R. Anderson

("Anderson") and Walter Randolph Anderson, Jr. ("Anderson Jr.")[1], asserting claims, *inter alia*,

seeking damages for fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty,

and violations of certain rules of the National Association of Securities Dealers ("NASD") and

New York Stock Exchange ("NYSE"). Pending before the Court are: (1) defendants' motion to

dismiss the complaint in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure for failure to state a claim for relief; and (2) plaintiff's cross motion pursuant to Rule

15(a)(2) of the Federal Rules of Civil Procedure for leave to amend the complaint. For the

reasons set forth below, defendants' motion is granted and plaintiff's cross motion is denied.

------------------

[1] All defendants except Anderson Jr., who has not appeared in this action, will collectively be
referred to herein as "defendants."

1

I.    BACKGROUND

    A.    Factual Background[2]

    Plaintiff owned a corporation, New York Medical, Inc. ("NY Medical"), through which

he sought to establish an employee stock ownership plan (ESOP) in order to "diversify[] his

personal assets and simultaneously reward[] employees of NY Medical." (Compl., ¶¶ 6, 81).

Specifically, plaintiff, "decided to engage in a so-called seller-financed ESOP transaction with

leveraged qualified replacement property (QRP), as defined in Section 1042 of the Internal

Revenue Code." (Compl., ¶ 84).

    On November 30, 2000, NY Medical and plaintiff entered into a letter agreement with

Citibank, N.A. ("Citibank"), pursuant to which Citibank agreed to lend NY Medical fifteen

million dollars ($15,000,000.00) upon NY Medical's execution of a demand note payable in that

amount to Citibank. (Compl., ¶ 85). On that same date: (1) Citibank loaned NY Medical fifteen

million dollars ($15,000,000.00); (2) NY Medical loaned the entire amount of the Citibank loan

proceeds to its ESOP; (3) the ESOP used the entire amount of NY Medical's loan proceeds to

purchase four hundred fifty thousand (450,000) shares of NY Medical's stock from plaintiff; (4)

plaintiff used the proceeds from the stock sale to lend NY Medical fifteen million dollars

($15,000,000.00); and (5) NY Medical used the proceeds of plaintiff's loan to satisfy its

obligation under the Citibank demand note. (Compl., ¶ 86). As a result of those transactions,

plaintiff did not retain any cash from his sale of stock to the ESOP, but held a note of NY

Medical in the amount of fifteen million dollars ($15,000,000.00) evidencing his loan to that

company. (Compl., ¶ 87).

---

[2] The following facts are taken from the complaint and are assumed to be true for the purposes
of this motion. They do not constitute findings of fact by the Court.

After plaintiff's sale of stock to the ESOP, he "sought to purchase certain QRP in order to defer under Section 1042 of the Internal Revenue Code recognition of any gain that he had realized on the sale of that stock." (Compl., ¶ 88). Since plaintiff did not retain any cash from his sale of stock to the ESOP, "he was unable to buy that QRP without borrowing the funds to do so." (Id.) On November 1, 2000, plaintiff, NY Medical and Citibank executed a "Revolving Credit Note (Multiple Advances)" ("the revolving credit note"), pursuant to which Citibank made available to plaintiff a line of credit not exceeding twelve million dollars ($12,000,000.00). (Compl., ¶ 89). According to plaintiff, the line of credit was a recourse loan on which he was allowed to draw during the period from November 1, 2000 to October 31, 2001. (Id.) On that same date, (1) plaintiff executed a "General Hypothecation Agreement" ("GHA"), pursuant to which he pledged certain rights to the QRP he intended to purchase with the loan proceeds that he borrowed against the line of credit as security for the line of credit, (Compl., ¶ 90); and (2) NY Medical executed a "General Security Agreement," pursuant to which it granted a security interest in all of its assets to Citibank as collateral for its obligations under the revolving credit note. (Compl., ¶ 91). Between November 2, 2000 and November 29, 2001, plaintiff purchased floating rate notes ("FRNs") as QRP at a total cost of fifteen million dollars ($15,000,000.00). (Id.)

On February 11, 2002, plaintiff and his wife executed the following documents amending the revolving credit note and GHA: (1) an "Amended and Restated Revolving Credit Note (Multiple Advances)" ("amended revolving credit note"), *inter alia*, increasing the Citibank line of credit to $13.5 million ("the Citibank increased line of credit"), and substituting plaintiff's wife for NY Medical as a borrower thereunder; and (2) an "Amended and Restated General

3

Hypothecation Agreement" ("the amended GHA"). (Compl., ¶ 92). According to plaintiff, he drew upon the Citibank increased line of credit, and used $1.5 million of his own funds, to purchase "$15 million of FRNs," and pledged those FRNs as security for the Citibank transaction. (Compl., ¶ 93).

Plaintiff alleges that "[i]n proposing a line of credit * * *, Citibank informed him that the use of FRNs as QRP would achieve a result known as 'zero-cost borrowing', which was [his] objective." (Compl., ¶ 95). According to plaintiff, on June 12, 2002, after Citibank failed to provide such "zero-cost borrowing" during 2001 and 2002, he retained Corporate Solutions Group, LLC ("CSG") "to assist him in negotiating with a different lender a new loan of $13.5 million dollars [sic] that would replace the Citibank increased line of credit." (Compl., ¶ 95).

On or about August 2002, CSG informed plaintiff about Derivium Capital, LLC ("Derivium"), (Compl., ¶ 96), a limited liability company of which Charles Cathcart ("C. Cathcart") was a fifty percent (50%) owner and Yuri Debevc and Scott Cathcart ("S. Cathcart") were each twenty-five percent (25%) owners (collectively, "the Derivium owners"). (Compl., ¶¶ 2, 35). At all relevant times: (1) other entities, including Optech Ltd. ("Optech"), Bancroft Ventures, Ltd. ("Bancroft"), Witco Services Ltd. ("Witco") and Veridia Solutions LC ("Veridia") (collectively, "the Derivium alter ego companies"), were wholly owned or controlled by the Derivium owners, (Compl., ¶¶ 3, 35); and (2) Anderson Jr. was an employee, the director of client services and an account executive of Derivium, (Compl., ¶ 9).

According to plaintiff, "Derivium perpetrated a fraudulent securities loan scheme known as the Derivium 90% Securities Loan Program" ("the 90% Loan Program"), (Id.), pursuant to which Derivium "purported to make loans to borrowers worth 90% of the value of their

4

securities." (Compl., ¶ 36). According to plaintiff, borrowers under the 90% Loan Program "would deposit their securities as collateral for the 90% Loan into accounts at one of several major brokerage houses, including Wachovia * * *, where their securities would purportedly be held and hedged by Derivium using what Derivium purported to be * * * a secret, proprietary hedging strategy. At the end of the loan term, borrowers could pay the loan balance and retrieve their collateral, surrender their collateral in satisfaction of the loan, or renew their loan." (Id.)

On August 19, 2002, Derivium prepared separate "ESOP QRP Loan-Indicative FRN Loan Term Sheets" ("the proposed loan term sheets") with respect to each of plaintiff's FRNs, proposing to lend plaintiff, on a nonrecourse basis, ninety percent (90%) of the face value of the respective FRN at a net interest rate calculated in accordance therein, (Compl., ¶ 97), and prohibiting (a) Derivium from calling the respective loan before maturity unless plaintiff was in default on that loan and (b) plaintiff from prepaying the principal of the respective loan before maturity, (Compl., ¶ 98).

On or about August 20, 2002, plaintiff received a letter from CSG outlining a proposal for ninety percent (90%) financing of the FRNs with no recourse loans. (Compl., ¶ 99). Shortly thereafter, plaintiff spoke to a CSG representative who represented, *inter alia*, (a) that the ninety percent (90%) financing was a loan and not subject to tax; (b) that the loan allows for a potential deferral of tax until the loan is due; and (c) that at the end of the loan term, the borrower would have the option to have the collateral, i.e., his FRNs, returned or the loan terminated. (Id.)

On or about August 28, 2002, Derivium sent plaintiff certain information regarding the proposed loans under the 90% Loan Program, including a "Master Agreement to Provide Financing and Custodial Services" and a separate Schedule A with respect to each of his FRNs,

each containing information that was "materially identical" to the information contained in the proposed loan term sheets. (Compl., ¶ 100). On September 20, 2002, Derivium sent plaintiff additional documents, (Compl., ¶ 101), and from September 23 to 26, 2002, Derivium sent plaintiff revised versions of certain of the documents previously sent, none of which differed materially from the documents previously sent to plaintiff on August 28, 2002. (Compl., ¶ 102).

According to plaintiff, "[a] major feature in the marketing material for the [90% Loan Program] was that the transaction was a loan, not a sale, so even though [he] would borrow 90% of the value of his securities as a loan * * *, [he] was told the refinance would not affect his capital gains tax deferral recognition from his prior [Citibank] transaction and [he] could continue to defer paying capital gains tax for the duration of the loan terms." (Compl., ¶ 13, 52). Other features of the 90% Loan Program that were marketed, and "which further induced [plaintiff] to enter into [it]," were: (1) that, during the terms of the respective loans, (a) the loans were non-recourse loans, (b) plaintiff would retain beneficial ownership in the pledged securities, (c) plaintiff was only required to make payments of interest, and (d) plaintiff could pre-pay the loan and receive the return of his pledged securities; and (2) that at the end of the loans' respective terms, plaintiff could either "(a) not repay any loan principal or accrued interest and relinquish his beneficial ownership interest in the securities to the Lender or (b) pay the loan principal and all accrued interest in full and receive the return of his pledged securities." (Compl., ¶¶ 20, 52-54). According to plaintiff, "[t]he right to reacquire the pledged securities at the end of the loan term by paying back the principal and interest together with his retention of beneficial ownership throughout the term of the loans was extremely important to [him] and was an inducement for him to enter into the [90% Loan Program]." (Compl., ¶ 21).

Plaintiff alleges that the representations "crafted and disseminated" by the Derivium owners about the 90% Loan Program in their publications, and through the company's website and consultants, "were false and gross lies," (Compl., ¶ 15), "intended to create the impression that they would employ derivative instruments to protect the value of the collateral and that the collateral would not be sold." (Compl., ¶ 37). Plaintiff further alleges that Wachovia knew of those representations, (Compl., ¶¶ 57-58, 61), and that they were false. (Compl., ¶ 52).

As of December 31, 2002, plaintiff was not required to recognize any of the gain that he realized on the sale of his NY Medical stock to the ESOP, having met the requirements of Section 1042 of the Internal Revenue Code. (Compl., ¶ 94).

On or about April 9, 2003, plaintiff entered into six (6) loans with Derivium and Bancroft under the 90% Loan Program. (Compl., ¶¶ 13, 50, 103). The terms of those loans ranged from twenty-seven (27) to thirty-eight (38) years. (Compl., ¶¶ 13, 65-66). According to plaintiff, at the time he entered into the loan transactions with Derivium, he "was in his early forties, such that based on his expected life expectancy, there was a probability that at the time the loan was due [he] would be deceased and, as such, his estate would have received a stepped up basis and, therefore, there would be little or no tax [sic] capital gains tax to his estate." (Compl., ¶ 19).

Plaintiff alleges that the Master Loan Financing and Security Agreement ("MLA") for every loan into which he entered under the 90% Loan Program indicates that "Derivium has the authority to transfer, pledge, or sell the collateral, but only during the Loan Term." (Compl., ¶ 46). According to plaintiff, the MLAs were not effective until the respective Loan Schedule was signed, and each Loan Schedule indicated that the Loan Term did not begin until the loan funds were disbursed to him. (Id.)

On April 15, 2003, pursuant to plaintiff's instruction, Citibank transferred his FRNs portfolio to a brokerage account at Wachovia, which plaintiff had opened at Derivium's instruction. (Compl., ¶¶ 62, 104). Plaintiff alleges that he was introduced to Wachovia, and its registered representatives, by Derivium. (Compl., ¶¶ 12, 54).[3]

According to plaintiff, when borrowers under the 90% Loan Program opened an account at Wachovia, they signed an Account Application that did not authorize Wachovia to sell any of the securities pledged. (Compl., ¶ 63). Plaintiff alleges that Wachovia selected Gordon as the financial advisor of his Wachovia brokerage account, but concealed from him the fact "that Gordon was also the financial advisor of all brokerage accounts held in the name of Derivium's entities and affiliates at Wachovia []." (Compl., ¶¶ 62-63). Plaintiff further alleges that he "had numerous discussions with Wachovia representatives," including Gordon, during which he emphasized: (1) "that the loan with Derivium was a refinance of his QRP loan to replace the securities he had sold to an ESOP[;]" and (2) "his great concern that the refinance of his QRP loan would not create any tax incidence and destroy the deferral of capital gains tax for the original QRP loan transaction." (Compl., ¶¶ 18, 61).

On April 21, 2003, plaintiff executed certain documents authorizing Wachovia to transfer each of his FRNs from his Wachovia brokerage account to a certain account maintained by Bancroft at Wachovia. (Compl., ¶¶ 63, 105). According to plaintiff, the authorization to transfer

---

[3] At all relevant times, Wachovia was a securities broker and dealer registered with the United States Securities and Exchange Commission ("SEC") and the State of New York and a member of the Financial Industry Regulatory Authority ("FINRA") and the NYSE. (Compl., ¶¶ 7, 139). Wells Fargo is the successor in interest to Wachovia. (Compl., ¶ 8). At all relevant times, Anderson was a vice president of Wachovia and the father of Anderson Jr., (Compl., ¶ 10); Eddy was an employee of Wachovia, (Compl., ¶ 11); and Gordon was the managing director and investment officer of Wachovia's Private Client Group. (Compl., ¶ 60).

his FRNs into Bancroft's Wachovia account did not authorize Wachovia to sell those securities, (Compl., ¶ 63), but Wachovia, nonetheless, sold them immediately upon their receipt without informing him, then transferred ninety percent (90%) of the proceeds from the sale to fund his loans and "pocketed" the remaining ten percent (10%). (Id.) According to plaintiff, "Wachovia was aware that each sale of [his] securities was in violation of the loan terms because the sales took place before the loan term began." (Compl., ¶ 70).

After plaintiff received the proceeds of the loans into which he entered under the 90% Loan Program, he used a portion of those proceeds to repay the outstanding balance on the Citibank increased line of credit. (Compl., ¶ 106).

Plaintiff alleges that he continued to receive from Wachovia quarterly account statements "falsely represent[ing] that the securities pledged as collateral were still held as collateral" until August 2005, when he was advised that Optech had taken over his collateral from Bancroft. (Compl., ¶ 65). According to plaintiff, by generating such false quarterly statements, thereby concealing the fact that his securities had immediately been sold upon their transfer to plaintiff's account at Wachovia, "Wachovia and Gordon intentionally aided Derivium to continue to conceal the fraudulent nature" of all six (6) of the loans into which he entered under the 90% Loan Program. (Compl., ¶ 65).

The 90% Loan Program, to which plaintiff refers as a "Ponzi scheme," collapsed and Derivium filed for bankruptcy in 2005. (Compl., ¶ 40).

Plaintiff alleges that the sale of his FRNs through the 90% Loan Program caused him "to lose the right to defer capital gains tax liability." (Compl., ¶ 56). According to plaintiff, on or about July 2007, he received notice from the United States Internal Revenue Service ("IRS") that

9

the loans into which he entered under the 90% Loan Program constituted a sale of his QRP and, therefore, there was no deferral of taxes from his stock sale to the ESOP and his failure to report the gain on the stock sale in the 2003 calendar year resulted in income taxes past due, as well as penalties and interest.[4] (Compl., ¶ 107). According to plaintiff, his tax indebtedness to the IRS exceeds four million dollars ($4,000,000.00). (Compl., ¶ 117). Plaintiff alleges that although he received notice of taxes, interest and penalties due from the IRS in 2007, "the notice made no mention of the conduct of Wachovia in the fraudulent scheme." (Compl., ¶ 66). Plaintiff was also notified by the State of New York ("the State") that he owed income taxes, penalties and interest in an amount in excess of one million dollars ($1,000,000.00) as a result of the sale of his QRP property, although he does not indicate when he received such notice. (Compl., ¶¶ 116-117).

Plaintiff alleges that notwithstanding the tax notices, he "remained unaware" that his securities had been sold and that Wachovia "knowingly and intentionally aided Derivium and played a major role in" the 90% Loan Program until July 2010, (Compl., ¶¶ 50, 62, 66, 71), "when counsel retained by [him] to represent him against the I.R.S.'s claim for deficient taxes advised [him] that Wachovia had played an active role in the Derivium fraudulent scheme."

---

[4] The Notice of Deficiency, attached to the petition filed in the United States Tax Court as Exhibit A, indicated, in relevant part: "It is determined that you recognized a capital gain as a result of your transaction with Derivium Capital in 2003. In particular, it is determined that the transaction with Derivium Capital constituted a sale of your securities, * * *. The details of the transactions with Derivium Capital that involved the sales of your property in return for $13,500,000.00 of cash/property in 2003 can be summarized as follows: [detailing the sales of six (6) FRNs on April 21, 2003]." (Picon Decl., Ex. A). The Court considers the Notice of Deficiency not for the truth of the matters asserted therein, i.e., that the sale of plaintiff's FRNs constituted a taxable transaction. Rather, the Notice of Deficiency is considered for the fact that it relayed certain information to plaintiff, i.e., the fact that his FRNs had been sold on April 21, 2003.

(Compl., ¶ 67).

According to plaintiff, certain "red flags" should have alerted Wachovia that Derivium and Bancroft were "unscrupulous clients," triggering a duty by Wachovia to investigate the 90% Loan Program transactions, including: (1) that "Derivium, with only modest assets of its own, generated * * * $1 billion in securities trades," (Compl., ¶ 28); (2) that "[s]ecurities with enormous value were transferred from other accounts to Derivium and Bancroft accounts maintained by Wachovia and sold by Wachovia immediately on instructions from Derivium, (id.); and (3) that Debevc, who was not an officer or employee of Bancroft, had signature authority for both Derivium and Bancroft accounts and "moved as much as $5 million or more at a time between th[o]se accounts, at will." (Compl., ¶¶ 29, 74). In addition, plaintiff alleges that "Derivium and its owners had a close relationship with Wachovia," insofar as Anderson Jr., "who raked off hundreds of thousands of dollars of commissions from the borrowers' securities sales [under the 90% Loan Program] * * * directed brokerage work for the sale of the securities loan collateral to Wachovia, where his father served as Vice President." (Compl., ¶ 30).

Plaintiff alleges, *inter alia*: (1) that "Wachovia knew that Derivium was depicting th[e] [securities sales under the 90% Loan Program] as 'securities loans' in which the borrowers were retaining ownership, even though (unbeknownst to the borrowers) Derivium was selling 100% of the collateral immediately" because Wachovia, particularly Gordon, was doing the selling "and assisting in the laundering of the proceeds," (Compl., ¶¶ 33, 44, 47-48, 59); (2) that Wachovia "knew, or should have known (in the exercise of due diligence and in compliance with NYSE Rule 405 'know your customer' requirements and NYSE Rule 342 'approval, supervision, and control' requirements) that uses made of investor's securities in the [90% Loan] [P]rogram did

11

not constitute 'hedging' as that term is used in the financial industry," (Compl., ¶ 47); and (3) that Wachovia "intentionally and substantially aided" Derivium in the 90% Loan Program by: (a) lending its name to Derivium to provide credibility for the 90% Loan Program; and (b) the fact that "high-level employees at Wachovia" helped carry out Derivium's fraudulent scheme. (Compl., ¶ 41).

Plaintiff alleges that Eddy aided in drafting the 90% Loan Program documents, including the MLA; established accounts at Wachovia for Derivium and through which the fraud occurred; processed the loan transactions under the 90% Loan Program; and tried to maintain Derivium's accounts at Wachovia, "even though Wachovia's own compliance officers knew it was not prudent or appropriate to do so." (Compl., ¶¶ 41, 45, 58). Plaintiff further alleges that Gordon and Eddy "set up and supervised Derivium's account activities, through which the fraudulent transactions occurred." (Compl., ¶¶ 42, 60). In addition, plaintiff alleges that Anderson "attempted to keep the Wachovia compliance department in the dark regarding Derivium's fraudulent activities and tried to convince Wachovia to hold on to Derivium's business as long as possible," (Compl., ¶¶ 43, 72), and also referred business to Derivium. (Compl., ¶ 72).


B.     Procedural History

On June 29, 2012, plaintiff commenced this action against defendants and Anderson Jr. asserting claims, *inter alia*, seeking damages for fraud (first cause of action), breach of fiduciary duty (second cause of action), aiding and abetting breach of fiduciary duty (third cause of action), and violations of certain NASD and NYSE rules (fourth cause of action). With respect to plaintiff's first cause of action, plaintiff alleges, *inter alia*, that Wachovia: (1) agreed with

Derivium to commit fraud against him and other borrowers under the 90% Loan Program; (2) acted in concert with Derivium and/or the Derivium owners by (a) drafting the loan documents that they knew falsely represented (i) that his securities would not be sold prior to the commencement date of the term of the loan, (ii) that he would retain beneficial ownership throughout the term of the loans and (iii) that the transactions would not trigger a taxable event, and (b) fraudulently mailing statements to him that represented that his securities were still being held in his account; (3) fraudulently represented that the proceeds given to him by Derivium were from a loan, as opposed to the sale of his securities; (4) failed to fully and properly disclose the full extent of the fees, commissions and profits it realized from the loans to him under the 90% Loan Program; (5) failed to disclose (a) that Derivium was operating a Ponzi scheme, (b) that Derivium would not hold his securities and would instead immediately sell them to enable it to fund the loans under the 90% Loan Program, and (c) that his securities had been sold immediately upon their receipt and prior to the loan term in violation of the Derivium loan agreements; and (6) concealed the facts (a) that his securities had been sold, and (b) that because of the sale, (i) he was not entitled to defer recognition of capital gains taxes contrary to Derivium's representations and his expectations, and (ii) he would not receive the return of his collateral at the maturity of his loans or if he elected to pre-pay the loans. (Compl., ¶¶ 110-111). Plaintiff alleges that Wachovia made the misrepresentations and omissions knowingly and/or recklessly, with the intent to defraud him and for the purpose of inducing him to rely upon them and/or to act or refrain from acting in reliance thereon. (Compl., ¶ 112-114). According to plaintiff, he relied upon Wachovia's misrepresentations to enter into the loans under the 90% Loan Program, as a result of which he sustained damages in excess of five million dollars

13

($5,000,000.00).[5] (Compl., ¶ 115).

With respect to his second cause of action, plaintiff alleges, *inter alia*, that Wachovia breached its fiduciary duty to him by: (1) acting adversely to his interests in selling his collateral, thereby divesting him of his beneficial interest in his securities and causing a taxable event; (2) mailing him monthly statements concealing the fact of the sale of his securities; (3) opening accounts for Derivium with the sole purpose of facilitating the sale of his securities; (4) preventing its compliance department from discovering the true nature of the Derivium transactions; and (5) participating in Derivium's fraudulent 90% Loan Program. (Compl., ¶¶ 124, 127).

With respect to his third cause of action, plaintiff alleges, *inter alia*: (1) that Wachovia knew (a) that Derivium was making false representations to him in the marketing of loans under the 90% Loan Program and in the loan agreements, (b) that Derivium owed a fiduciary duty to him, (c) that Derivium had no authority to sell his securities before the loan transactions were funded, and (d) that Derivium was engaging in fraudulent conduct and breaching its fiduciary duty to him; and (2) that Wachovia provided "substantial assistance" to Derivium by (a) participating in the marketing of the fraudulent 90% Loan Program, (b) participating in the drafting of the fraudulent loan documents under the 90% Loan Program, (c) carrying out the fraudulent transactions under the 90% Loan Program, (d) concealing Derivium's fraudulent conduct from him, (e) failing to inform him that his pledged securities would not be used as expected, and (f) clearing unauthorized trades for Derivium. (Compl., ¶¶ 130-135).

---

[5] In addition to his tax indebtedness to both the IRS and State in an amount exceeding five million dollars, plaintiff alleges that the sale of his collateral resulted in a loss of his investment in the FRNs in the amount of $1.5 million. (Compl., ¶ 118).

With respect to his fourth cause of action, plaintiff alleges, *inter alia*, that Wachovia violated the following rules of the NASD and NYSE: (1) NASD Rule 2210, imposing a requirement to abide by high standards of commercial honor and just and equitable principles of trade; (2) NASD Rule 2120, prohibiting the use of any manipulative, deceptive or other fraudulent device or contrivance; (3) NYSE Rule 406, imposing a requirement to "know your customer," i.e., to use due diligence to learn the essential facts relative to every customer, order and account; and (4) NASD Rule 3010 and NYSE Rule 342, imposing requirements of "approval, supervision and control," i.e., to establish and implement a supervisory and review system to detect and prevent violations of applicable securities law and NASD rules. (Compl., ¶¶ 140-144).

Defendants now move to dismiss the complaint in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief and plaintiff cross-moves pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure for leave to amend the complaint.

I.      DISCUSSION

A.      Standard of Review

The standard of review on a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). The pleading of specific facts is not required; rather a complaint need only give the defendant "fair notice of what the * * * claim is and the grounds upon which it rests."

Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. 544, 127 S.Ct. at 1959. The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. See McGarry v. Pallito, 687 F.3d 505, 510 (2d Cir. 2012); Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. 662, 129 S.Ct. at 1949. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 1950; see also Ruston v. Town Board for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010) ("A court can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." (quotations and citations omitted)). Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." Arista Records, LLC v. Doe 3, 604 F.3d

110, 120-1 (2d Cir. 2010); see also Matson v. Board of Education of City School District of New York, 631 F.3d 57, 63 (2d Cir. 2011) ("While a complaint need not contain detailed factual allegations, it requires more than an unadorned, the defendant-unlawfully-harmed-me accusation." (internal quotations and citation omitted)).

The Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002) (citing International Audiotext Network, Inc. v. American Tel. and Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)); see also L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011).

### 1. Materials of which Judicial Notice May Be Taken

"[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents * * *." Staehr v. Hartford Financial Services Group, Inc., 547 F.3d 406, 425 (2d Cir. 2008); see also In re Zyprexa Products Liability Litigation, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008) ("Judicial notice can be taken of prior complaints and legal proceedings, press releases and news articles and published analyst reports in determining what the market knew.") Thus, a court may consider such materials "for the purpose of establishing that the information in the various documents was publicly available." Staehr, 547 F.3d at 426.

Moreover, "[a] court may take judicial notice of a document filed in another court not for

the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." Global Network Communications, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006) (quoting International Star Class Yacht Racing Association v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir. 1998)). A district court may also "take judicial notice of admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action." Harris v. New York State Department of Health, 202 F. Supp. 2d 143, 173 n. 13 (S.D.N.Y. 2002); see also Munno v. Town of Orangetown, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005) (accord); Abdul-Rahman v. City of New York, No. 10 Civ. 2778, 2012 WL 1077762, at * 3 (E.D.N.Y. Mar. 30, 2012) (considering transcripts from the plaintiff's criminal trial as party admissions made in public records whose authenticity is not in dispute); 5-Star Management, Inc. v. Rogers, 940 F. Supp. 512, 519 (E.D.N.Y. 1996) (finding it appropriate to consider the plaintiff's principal's admission in a prior state court action for the truth of the matter asserted, without converting the motion to dismiss into a motion for summary judgment, because (1) the plaintiff had made a critical admission that bore substantially upon the legal sufficiency of his complaint, (2) the plaintiff had sufficient notice of the defendant's intention to ask the Court to take judicial notice of the admission and of the factual significance that the defendants sought to attach to the admission, (3) the plaintiff failed to object to consideration of the admission and (4) the plaintiff failed to disavow the admission). "The plain purpose of th[is] exception is to prevent plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting." Abdul-Rahman, 2012 WL 1077762, at * 3 (quotations and citations omitted).

The Court takes judicial notice of the following media report and court filings, not for the truth of the matters asserted therein, but rather to establish the fact that the information in those materials was publicly available, see Staehr, 547 F.3d at 425 (finding that the district court did not abuse its discretion in denying the plaintiffs' motion to strike media reports, state court complaints and regulatory filings submitted by the defendants for judicial notice purposes because those materials "were offered to show that certain things were said in the press, and that assertions were made in lawsuits and regulatory filings, which is all that is required to trigger inquiry notice"):

(1)     On April 9, 2003, a borrower under the 90% Loan Program commenced an action against, *inter alia*, Derivium and Wachovia in the United States District Court for the District of Connecticut, asserting, *inter alia*, a claim for breach of fiduciary duty against Wachovia. McCarty v. Derivium Capital, LLC, No. 3:03 CV 00651 MRK (D. Conn.).

(2)     In 2004, General Holding Inc. ("General Holding") commenced an action against, *inter alia*, Bancroft, the Derivium owners, Derivium, Veridia and Optech in the United States District Court for the District of California, Sacramento Division, asserting claims, *inter alia*, for fraud, conversion and violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(a). General Holding Inc. v. Cathcart, No. 2:04-2749-DFL-DAD (D. Calif.).

(3)     On May 3, 2005, Newton Family LLC ("Newton Family") commenced an action against, *inter alia*, Derivium, Bancroft, the Derivium owners and Veridia, asserting claims, *inter alia*, for fraud, constructive fraud, RICO violations,

conversion and federal securities fraud. <u>Newton Family LLC v. Cathcart</u>, No.
2:07-cv-2964-DCN (D. S.C.).

(4)    In September 2005, Derivium filed for Chapter 11 bankruptcy in the United States
Bankruptcy Court for the Southern District of New York. <u>In re Derivium Capital,
LLC</u>, No. 05-37491 (Bankr. S.D.N.Y.).

(5)    On October 17, 2005, Forbes.Com published an article about Derivium's 90%
Loan Program, referring to it as "a very sophisticated Ponzi scheme;" indicating,
*inter alia*, that "Derivium * * *, is in bankruptcy and under investigation by the
Internal Revenue Service" and that Cathcart had said in a deposition the previous
year that "he controlled the risk of a slide in the stock price by immediately selling
the stock * * * [and] had no 'specific knowledge' of what hedges actually took
place[;]" and referencing five (5) arbitrations and/or suits that had already been
brought against Derivium by investors in the 90% Loan Program. Janet Novack,
*Offshore Mystery*, (Oct. 17, 2005), at
http://www.forbes.com/forbes/2005/1017/058_print.html. (Picon Decl., Ex. C).

(6)    On November 3, 2005, WCN/GAN Partners Ltd. ("WCN/GAN") commenced an
action against the Derivium owners and Bancroft asserting claims, *inter alia*, for
fraud, constructive fraud, RICO violations, conversion and federal securities
fraud. <u>WCN/GAN Partners Ltd. v. Cathcart</u>, No. 2:07-cv-2965-DCN (D. S.C.).

(7)    In November 2005, the bankruptcy case was converted to Chapter 7 and was
transferred to the District of South Carolina, where Kevin Campbell ("Campbell")
was appointed as Derivium's trustee. <u>In re Derivium Capital, LLC</u>, No. C.A. 05-

15042-JW.

(8)     In November 2005 and February 2006, two (2) unpublished decisions, reasonably accessible via electronic media, were entered in <u>McCarty v. Derivium Capital, LLC</u>, No. 3:03 CV 00651 MRK, 2005 WL 3320564 (D. Conn. Nov. 21, 2005) (granting a co-defendant's motion to dismiss) and 2006 WL 413258 (D. Conn. Feb. 21, 2006) (granting Wachovia's motion to dismiss).

(9)     On April 11, 2006, the <u>General Holding</u> action was transferred to the United States District Court for the District of South Carolina. <u>General Holding Inc. v. Cathcart</u>, No. 2:06-cv-1121-DCN (D. S.C.).

(10)    In May and July 2006, two (2) unpublished decisions, reasonably accessible via electronic media, were entered in the bankruptcy proceeding. <u>Derivium Capital LLC v. U.S. Trustee</u>, No. 05 Civ. 10845, 2006 WL 1317021 (S.D.N.Y. May 12, 2006) (affirming conversion of Chapter 11 bankruptcy proceeding to a Chapter 7 proceeding and granting the motion of four (4) borrowers under the 90% Loan Program seeking leave to intervene in the appeal); <u>In re Derivium Capital, LLC</u>, No. C.A. 05-15042-JW, 2006 WL 2827361 (Bankr. D. S.C. July 31, 2006) (denying motion of C. Cathcart seeking a temporary restraining order to stay several legal actions filed against him in the State of California).

(11)    On June 9, 2006, C. Cathcart commenced an adversary proceeding against, *inter alia*, Campbell, General Holding, Newton Family and WCN/GAN seeking, *inter alia*, a temporary restraining order and an injunction prohibiting the prosecution of the actions commenced against him in other fora related to his activities as

21

Derivium's principal ("the Cathcart adversary proceeding"). Cathcart v. General Holding. Inc., Adv. No. 06-80114-JW (Bankr. D. S.C.).

(12)    On August 10, 2006, Campbell commenced an adversary proceeding against, *inter alia*, the Derivium owners, Veridia and Derivium in the United States Bankruptcy Court for the District of South Carolina, asserting causes of action for turnover, fraudulent and preferential transfers, post-petition transfers, substantive consolidation, conversion and alter ego liability ("the Campbell adversary proceeding"). Campbell v. Cathcart, Adv. No. 06-80163 (Bankr. D. S.C.).

(13)    In December 2006, two (2) published decisions were entered in the Campbell adversary proceeding. In re Derivium Capital, LLC, 380 B.R. 429 (Bankr. D. S.C. Dec. 22, 2006) (granting in part and denying in part the motion to dismiss of Veristeel, Inc., an entity in which the Derivium owners owned beneficial interests) and 380 B.R. 407 (Bankr. D. S.C. Dec. 22, 2006) (granting in part and denying in part the motions to dismiss of C. Cathcart, Derivium and S. Cathcart).

(14)    On February 9, 2007, Campbell's motion to withdraw the reference in the Campbell adversary proceeding was granted. Campbell's action was reopened in the United States District Court for the District of South Carolina, alleging claims, *inter alia*, for actual and constructive fraudulent conveyance, breach of fiduciary duty, and RICO violations. Campbell v. Cathcart, No. 2:06-cv-3283-DCN (D. S.C.).

(15)    On February 28, 2007, Alan M. Grayson and AMG Trust commenced an action against, *inter alia*, the Derivium owners, Derivium, Veridia, Bancroft and

Wachovia in the United States District Court for the District of South Carolina. Grayson v. Cathcart, No. 2:07-cv-593-DCN (D. S.C.).

(16) In March 2007, a published decision was entered in the Cathcart adversary proceeding. In re Derivium Capital, LLC, 372 B.R. 777 (Bankr. D. S.C. Mar. 16, 2007) (*inter alia*, granting Campbell's motion for summary judgment as to C. Cathcart's fourth cause of action; denying C. Cathcart's motion seeking dismissal of the adversary proceeding without prejudice as to General Holding, but otherwise granting C. Cathcart's motion as to the remaining defendants; and granting General Holding's motion seeking dismissal of the adversary proceeding as against it with prejudice).

(17) On March 22, 2007, Robert G. Sabelhaus and Melanie R. Sabelhaus commenced an action against, *inter alia*, the Derivium owners, Derivium, Veridia, Witco and Optech in the United States District Court for the District of South Carolina, asserting claims, *inter alia*, for fraud, RICO violations and actual and constructive fraudulent conveyance. Sabelhaus v. Cathcart, No. 2:07-cv-790-DCN (D. S.C.).

(18) In August 2007, an adversary proceeding was commenced against, *inter alia*, Wachovia in the United States Bankruptcy Court for the District of South Carolina asserting, *inter alia*, nine (9) tort claims, including claims for aiding and abetting fraud, aiding and abetting breach of fiduciary duty and breach of fiduciary duty ("the Wachovia adversary proceeding"). Grayson Consulting, Inc. v. Wachovia, Adv. Pro. 07-80119-JW (Bankr. D. S.C.).

(19) On September 7, 2007, the actions commenced and/or transferred to the United

23

States District Court for the District of South Carolina by Newton Family, WCN/GAN, Sabelhaus, Grayson and Campbell, together with another action commenced by Campbell, were consolidated with the General Holding case. General Holding Inc. v. Cathcart, No. 2:06-cv-1121-DCN (D. S.C.).

(20)    On September 17, 2007, the United States commenced an action against, *inter alia*, Derivium, Veridia and the Derivium owners in the United States District Court for the Northern District of California to enjoin the promotion of the 90% Loan Program as a tax-fraud scheme ("the California Cathcart case"). United States v. Cathcart, No. C 07-04762 PJH (N.D. Calif.)

(21)    In October 2007, a published decision was entered in the bankruptcy proceeding. In re Derivium Capital, LLC, 380 B.R. 392 (Bankr. D. S.C. 2007) (denying Campbell's application for Sale of Property Free and Clear of Lien and Settlement of Claims in Connection Therewith).

(22)    On December 21, 2007, borrowers under the 90% Loan Program commenced an action in the United States District Court for the Northern District of California challenging the IRS's treatment of a loan into which they entered under the 90% Loan Program in 2000 as a sale of stock. Schlachte v. United States, No. C 07-6446 PJH (N.D. Calif.)

(23)    Between April 2008 and September 2009, nine (9) unpublished decisions, reasonably accessible via electronic media, were rendered in the California Cathcart case. United States v. Cathcart, No. C 07-4762 PJH, 2008 WL 1787881 (N.D. Calif. Apr. 18, 2008) (granting the government's motion to file an amended

complaint); 2008 WL 2661941 (N.D. Calif. June 27, 2008) (denying a defendant's motions to sever all claims against him and to transfer venue to the District of South Carolina); 2008 WL 4279716 (N.D. Calif. Sept. 12, 2008) (denying the same defendant's motion for a stay or, in the alternative, to sever the claims against him and transfer venue); 2008 WL 4279717 (N.D. Calif. Sept. 15, 2008) (granting in part and denying in part the motion to dismiss by Optech and its principal); 2009 WL 482220 (N.D. Calif. Feb. 25, 2009) (granting in part and denying in part a defendant's motions to compel depositions and discovery responses); 2009 WL 910150 (N.D. Calif. Apr. 2, 2009) (sustaining the government's objections and overruling the defendants' objections to the February 25, 2009 order); 2009 WL 1764642 (N.D. Calif. June 18, 2009) (sustaining the government's objection to a May 12, 2009 discovery order); 2009 WL 1817006 (N.D. Calif. June 24, 2009) (denying a motion to extend the deadline for filing dispositive motions); and 2009 WL 3103652 (N.D. Calif. Sept. 22, 2009) (*inter alia*, granting the government's motion for partial summary judgment; granting in part and denying in part Optech's motion for summary judgment; and denying the Derivium owners' motions for summary judgment).

(24)   In August 2008, an unpublished decision, reasonably accessible via electronic media, was rendered in the Schlachte action. Schlachte v. United States, No. C 07-6446 PJH, 2008 WL 3977901 (N.D. Calif. Aug. 26, 2008) (granting government's motion to dismiss the plaintiffs' theft loss claim).

(25) In September 2008, a published decision was entered in the Wachovia adversary proceeding. In re Derivium Capital, LLC, 396 B.R. 184 (Bankr. D. S.C. 2008) (granting in part and denying in part Wachovia's motion to dismiss the second amended complaint).

(26) On January 30, 2009, two (2) borrowers under the 90% Loan Program commenced an action against, *inter alia*, Wachovia and Eddy in the United States District Court for the Eastern District of Michigan, alleging, *inter alia*, fraud, fraudulent concealment and concert of action. Schafer v. Johanson, No. 09-10349-BC (E.D. Mich.)

(27) On June 25, 2009, plaintiff filed a petition in the United States Tax Court, Landow v. Commissioner of Internal Revenue, No. 15506-09, in which he indicated, *inter alia*:

    (a) that since he was "[u]nwilling to rely solely on representatives of Derivium or its representatives [that the refinancing transaction under the 90% Loan Program would not trigger [capital] gain recognition], [he] contacted several respected, independent tax attorneys, and ultimately engaged a reputable law firm in 2002 to provide a tax opinion concerning whether refinancing the QRP would trigger [capital] gain recognition under Section 1042[;]"

    (b) that the "tax opinion, which [he] received in March 2003, concluded that the Derivium loan transactions would not constitute a disposition of the underlying collateral[;]"

(c)    that "[b]ased on assurances from his independent tax and legal advisors, [he] refinanced his line of credit with Citibank through Derivium and its affiliated lender, Bancroft * * *[;]"

(d)    that "[i]n 2005, [he] was notified that his loans were transferred to Optech Ltd. * * * [and] wrote to Optech, requesting that it confirm that it held the FRN collateral * * *[;]" and

(e)    that "[he] did not receive a timely response from Optech." (Declaration of David A. Picon in Support of Defendants' Motion to Dismiss ["Picon Decl."], Ex. A, at pp. 6-7).

(28)    On July 6, 2009, a borrower under the 90% Loan Program commenced an action against, *inter alia*, Wachovia in the United States District Court for the Central District of California, alleging, *inter alia*, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, conspiracy to commit fraud and aiding and abetting fraud. <u>Sollberger v. Wachovia</u>, No. 8:09cv00766 (C.D. Calif.).

(29)    In July 2009, an unpublished decision, reasonably accessible via electronic media, was entered in the consolidated <u>General Holding</u> cases. <u>General Holding, Inc. v. Cathcart</u>, Nos. 2:06-cv-1121-DCN, 2:06-cv-3283-DCN, 2:07-cv-0593-DCN, 2:07-cv-0790-DCN, 2:07-cv-2964-DCN, 2:07-cv-2965-DCN, 2:07-cv-2992-DCN, 2009 WL 9119981 (D. S.C. July 29, 2009) (finding, after a jury trial at which the jury found in favor of Campbell, General Holding, the Sabelhauses, Grayson and AMG Trust, WCN/GAN and Newton Family on their respective claims for actual and constructive fraudulent conveyance, breach of fiduciary

duty, RICO violations, fraud, conversion, Uniform Securities Act fraud, constructive fraud and/or federal securities fraud, in favor of plaintiffs on their respective non-jury claims for piercing the corporate veil against Cathcart and Debevc and/or for alter ego liability against, *inter alia*, Veridia, and awarding actual damages).

(30)    In August 2009, an unpublished decision, reasonably accessible via electronic media, was rendered in the Schafer action. Schafer v. Johanson, No. 09-10349-BC, 2009 WL 2496943 (E.D. Mich. Aug. 17, 2009) (denying motion to dismiss or to compel arbitration of certain defendants; denying plaintiff's motion seeking declaration that their claims against certain other defendants are not arbitrable; and denying Wachovia's motion to dismiss or to compel arbitration as moot in light of the plaintiffs' voluntary dismissal of their claims against it).

(31)    On or about October 8, 2010, plaintiff commenced an arbitration against defendants with FINRA Dispute Resolution, asserting causes of action for fraud, concealment, aiding and abetting fraud, conspiracy to commit fraud, breach of fiduciary duty, violation of NASD and NYSE rules and violations of 18 U.S.C. §§ 1961 and 1962, all relating to the 90% Loan Program. (Picon Decl., Ex. F).[6]


B.    Choice of Law

Since jurisdiction in this case is premised upon diversity of citizenship, the choice-of-law

---

[6] Plaintiff withdrew his FINRA Dispute Resolution claims against Anderson and Eddy with prejudice by letters dated February 3, 2011 and February 16, 2011. (Picon Decl., Ex. F). On or about June 28, 2011, an award was issued dismissing plaintiff's claims in the FINRA Dispute Resolution arbitration with prejudice. (Id.)

rules and statutes of limitations of the state in which this Court sits, i.e., New York, are applied. See Stuart v. American Cyanamid Co., 158 F.3d 622, 626 (2d Cir. 1998) ("Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations."); see also Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d 424, 433 (2d Cir. 2012) ("A federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state."); Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704, 709 (2d Cir. 2002) ("[I]n diversity cases state law governs not only the limitations period but also the commencement of the limitations period. * * * To determine which state's law applies, a federal court sitting in diversity must apply the conflict-of-laws rules of the state in which the federal court sits.")

"New York courts generally apply New York's statutes of limitations, even when the injury giving rise to the action occurred outside New York." Stuart, 158 F.3d at 627. "This general rule, however, is subject to * * * New York's 'borrowing' statute, C.P.L.R. § 202." Id.

New York's "borrowing" statute provides that "[a]n action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply." Thus, "[u]nder C.P.L.R. § 202, when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued." Stuart, 158 F.3d at 627; see also Muto v. CBS Corp., 668 F.3d 53, 57 (2d Cir. 2012) (accord); Cantor Fitzgerald, 313 F.3d at 710 (accord). However,

plaintiffs who are residents of the State of New York are "affected only by the New York limitations period." Braniff Airways, Inc. v. Curtiss-Wright Corp., 424 F.2d 427, 428 (2d Cir. 1970); see also Kilmer v. Flocar, Inc., 212 F.R.D. 66, 70 (N.D.N.Y. 2002) ("[W]hile non-New York State residents always face the shorter statute of limitations as between New York and the accrual state, New York State residents are always subject to the New York statute of limitations.")

Since plaintiff is a resident of the State of New York, (Compl., ¶ 6), it is undisputed that New York's statutes of limitations apply.

C.    Statutes of Limitations

New York law provides that an action based upon fraud, including claims of aiding and abetting and conspiracy to commit fraud, must be commenced within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff * * * discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8); see also Koch v. Christie's International PLC, 699 F.3d 141, 154 (2d Cir. 2012) (aiding and abetting and conspiracy to commit fraud); Sargiss v. Magarelli, 12 N.Y.3d 527, 532, 881 N.Y.S.2d 651, 909 N.E.2d 573 (N.Y. 2009). Claims for breach of fiduciary duty, and aiding and abetting breach of fiduciary duty, that are based upon fraud are subject to the same limitations period, i.e., six (6) years from the date the cause of action accrued or two (2) years from the time the plaintiff discovered, or could with reasonable diligence have discovered, the fraud. See Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 361 (2d Cir. 2013); IDT Corp. v. Morgan Stanley Dean Witter & Co., 12 N.Y.3d 132, 139, 879 N.Y.S.2d 355, 907 N.E.2d 268 (N.Y. 2009) ("[W]here an

30

allegation of fraud is essential to a breach of fiduciary duty claim, * * * a six-year statute of limitations * * * [applies]." (citations omitted)); Dolmetta v. Uintah National Corp., 712 F.2d 15, 19 (2d Cir. 1983) (aiding and abetting breach of fiduciary duty); Balta v. Ayco Co., LP, 626 F. Supp. 2d 347, 359 (W.D.N.Y. 2009) ("The statute of limitations for a claim of aiding and abetting a breach of fiduciary duty is the same limitations period that would apply to the underlying breach.") Since all of plaintiff's claims that defendants breached their fiduciary duty, or aided and abetted the breach of a fiduciary duty, to him are essentially fraud-based claims, they are subject to the same six (6)-year/two (2)-year limitations period applicable to his fraud claims.

Under New York law, "[a] cause of action to recover damages for fraud cannot accrue until every element of the claim, including injury, can truthfully be alleged." Carbon Capital Management, LLC v. American Express Co., 88 A.D.3d 933, 939, 932 N.Y.S.2d 488 (2d Dept. 2011) (quoting New York City Transit Authority v. Morris J. Eisen, P.C., 276 A.D.2d 78, 85, 715 N.Y.S.2d 232 (1st Dept. 2000) (brackets omitted)). Since plaintiff's fraud-based claims, including his breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims, against defendants are premised upon the sale of his FRNs immediately upon their transfer from his Wachovia account to an account maintained by Bancroft at Wachovia, resulting in the loss of his right to defer capital gains tax liability,[7] it is undisputed that those claims accrued no later

---

[7] Although plaintiff alleges that certain misrepresentations were made in the marketing of the 90% Loan Program to him which induced him to enter into the six (6) loans under the 90% Loan Program, and that Wachovia was aware of those representations and that they were false, it is clear that defendants did not make any of those misrepresentations to plaintiff, and that plaintiff could not have relied upon any misrepresentations by defendants in entering into those loans, since he further alleges that it was Derivium that introduced him to Wachovia and instructed him to open an account at Wachovia into which the purported loan proceeds could be transferred. (Compl., ¶¶ 12, 54, 62, 104). In addition, plaintiff alleges that when Gordon set up his

than April 21, 2003, when the transfer occurred. Since this action was not commenced until June 29, 2012, more than nine (9) years after the fraud occurred, plaintiff's fraud-based claims, including his fraud-based breach of fiduciary duty and aiding and abetting breach of fiduciary claims, are timely only if they were commenced within two (2) years of the date plaintiff discovered the fraud, or could have discovered the fraud in the exercise of reasonable diligence.

### 1. Inquiry Notice

"With respect to inquiry notice, a duty to inquire is triggered by information that relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants." Cohen, 711 F.3d at 361 (quotations and citation omitted); see also Sargiss, 12 N.Y.3d at 532, 881 N.Y.S.2d 651 ("The inquiry as to whether a plaintiff could, with reasonable diligence, have discovered the fraud turns on whether the plaintiff was possessed of knowledge of facts from which the fraud could be reasonably inferred * * *." (brackets, quotations and citation omitted)). "The triggering information need not detail every aspect of the subsequently alleged fraudulent scheme." Cohen, 711 F.3d at 361 (brackets, quotations and citation omitted); see also Staehr, 547 F.3d at 427 ("'Storm warnings' need not detail every aspect of the alleged fraudulent scheme * * *. Rather, a totality-of-the-circumstances analysis applies.") "If a complaint alleges various frauds, an investor need not know the details of each fraud in order to be placed on inquiry notice." Staehr, 547 F.3d at 434. "Generally, knowledge of the fraudulent

---

Wachovia account, "Gordon knew [plaintiff] had entered into a 90% Loan with Derivium." (Compl., ¶ 63). Thus, it is clear that plaintiff had no relationship with Wachovia until after he had entered into the 90% Loan Program with Derivium. Indeed, in his petition to the Tax Court, plaintiff specifically asserted that he relied upon Derivium's representations and the opinion of an independent tax attorney in entering into the 90% Loan Program, not upon any representations made by defendants.

act is required and mere suspicion will not constitute a sufficient substitute." Sargiss, 12 N.Y.3d at 532, 881 N.Y.S.2d 651 (quotations and citation omitted).

"Inquiry notice imposes an obligation of reasonable diligence." Cohen, 711 F.3d at 362. "[T]he date on which knowledge of a fraud will be imputed to a plaintiff can depend on the plaintiff's investigative efforts." Id., at 361. "If the plaintiff makes no inquiry once the duty to inquire arises, knowledge will be imputed as of the date the duty arose." Id. at 361-62 (quotations and citations omitted); see also Koch, 699 F.3d at 155 ("New York law recognizes * * * that a plaintiff may be put on inquiry notice, which can trigger the running of the statute of limitations[,] if the plaintiff does not pursue a reasonable investigation.") "[I]f some inquiry is made, the court will impute knowledge of what a plaintiff in the exercise of reasonable diligence should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud." Cohen, 711 F.3d at 362 (brackets, quotations and citations omitted).

"Although determining whether a plaintiff had sufficient facts to place her on inquiry notice is often inappropriate for resolution on a motion to dismiss, [the Second Circuit] ha[s] found dismissal appropriate where the facts needed for determination of when a reasonable plaintiff of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers integral to the complaint," Cohen, 711 F.3d at 362 (alterations, quotations and citations omitted), as well as from matters of which judicial notice may properly be taken. See Staehr, 547 F.3d at 427 ("Inquiry notice may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct.") Moreover, "it is proper under New York law to dismiss a fraud claim

on a motion to dismiss pursuant to the two-year discovery rule when the alleged facts do establish that a duty of inquiry existed and that an inquiry was not pursued." <u>Koch</u>, 699 F.3d at 155-56. In sum, "where the facts would suggest the probability of fraud to a reasonably intelligent person, failure to investigate will prove fatal to the plaintiff's claim if such a claim is not brought within the statutory limitations period beginning from the time of such inquiry notice." <u>Id.</u> at 156.

"Whether a plaintiff was placed on inquiry notice is analyzed under an objective standard." <u>Staehr</u>, 547 F.3d at 427. "Given the objective standard for inquiry notice, there is an inherent sliding scale in assessing whether inquiry notice was triggered by information in the public domain: the more widespread and prominent the public information disclosing the facts underlying the fraud, the more accessible this information is to plaintiff, and the less company-specific the information must be." <u>Id.</u> at 432.

The question, thus, is whether plaintiff could reasonably have inferred any of defendants' fraud from the facts known to him, or that were publicly asserted and reasonably accessible upon diligent inquiry. Assuming the truth of plaintiff's allegation that Wachovia continued to send him quarterly account statements falsely representing to him that his FRNs were still being held as collateral under the loans, such quarterly statements ended as of August 2005. (Compl. ¶ 65). Accordingly, defendants' purported concealment of the fraud ended as of August 2005, almost seven (7) years prior to the commencement of this action. Nonetheless, it cannot be ascertained based upon the pleadings and documents integral thereto, or upon the matters of which judicial notice may be taken, whether plaintiff was placed on inquiry notice of defendants' purported fraud as of August 2005, when the quarterly statements stopped.

However, it is clear that plaintiff had knowledge of at least one fraudulent act, i.e., that his FRNs had been sold, and, thus, were no longer being held as collateral, no later than July 2007, when he received notice from the IRS that he owed taxes, penalties and interest based upon the sale of those FRNs. It is the very sale of the FRNs immediately upon their transfer from plaintiff's Wachovia account to the Wachovia account held by Bancroft, purportedly prior to the commencement of the respective loan terms, upon which plaintiff premises most of his fraud-based claims against defendants. The sale of a borrower's collateral immediately upon the transfer of such collateral from the borrower's brokerage account at Wachovia to another Wachovia account, purportedly in direct contravention of the loan terms and the representations previously made to the borrower, would suggest the probability of fraud, and defendants' participation therein, to a reasonably intelligent borrower. Thus, plaintiff clearly had knowledge of facts from which the alleged fraud by defendants might reasonably be inferred as of 2007, prompting a duty to inquire under New York law. See, e.g. Hopkinson v. Estate of Siegal, 470 Fed. Appx. 35, 36 (2d Cir. May 21, 2012) (summary order) ("Courts applying New York law have already determined that plaintiffs * * * who purport to have invested in fraudulent tax shelters may be on notice when the Internal Revenue Service announces an investigation of those shelters."); Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 460-61 (S.D.N.Y. 2009) (holding that the plaintiff, who alleged that he had been induced to participate in a fraudulent tax shelter, "certainly knew of the fraud * * * when he received a tax bill disallowing the [tax] shelter.")

"[O]ne who suspects a defendant of widespread fraud may be under a duty to see if others have sued the defendant and whether such suits revealed evidence of the fraud of which the plaintiff complains * * *." Cohen, 711 F.3d at 363. Had plaintiff engaged in even the most

35

minimal of inquiries upon learning that the IRS viewed his loans under the 90% Loan Program as sales of his securities in July 2007, he would have discovered not only that Derivium had filed for bankruptcy, but also that since as early as April 2003, no less than eight (8) actions relating to the 90% Loan Program had been commenced, two (2) of which, McCarty and Grayson, asserted fraud-based claims against Wachovia similar to those asserted by plaintiff in this action. Prior to July 2007, there had been two (2) published decisions in the Campbell adversary proceeding, one (1) published decision in the Cathcart adversary proceeding and four (4) decisions, unpublished but reasonably accessible via electronic media, in two (2) other actions, including two (2) in the McCarty action against, *inter alia*, Wachovia. Thus, at the time plaintiff received the IRS notice, the existence of the bankruptcy proceeding and at least four (4) of the actions relating to the 90% Loan Program, including one (1) naming Wachovia as a defendant, was reasonably ascertainable. Since plaintiff made no timely inquiry into defendants' role in the purported fraud, notwithstanding his knowledge that his FRNs had been sold as of July 2007, knowledge of the fraud can be imputed to him as of that time.

Even assuming, *arguendo*: (1) that knowledge of the fraudulent act alone is insufficient to trigger inquiry notice, and that defendants' role in the fraud must also have been apparent; and (2) that the existence of one (1) action alleging Wachovia's role in the purported fraud was also insufficient to trigger inquiry notice, but see Staehr, 547 F.3d at 435 (finding that the filing of one (1) previous lawsuit containing allegations that were similar to some of the key allegations in the plaintiff's complaint would trigger inquiry notice so long as a person of ordinary intelligence would have been reasonably aware of the complaint), between July 2007 and June 2010, when plaintiff alleges that he first learned of Wachovia's purported fraud, no less than five (5)

additional actions relating to the 90% Loan Program were commenced, three (3) of which, the Wachovia adversary proceeding, the Schafer action and the Sollberger action, asserted fraud-based claims against Wachovia.[8] Within that same period, there were two (2) published decisions, one (1) in the bankruptcy proceeding and one (1) in the Wachovia adversary proceeding, and twelve (12) decisions, unpublished but reasonably accessible via electronic media, in four (4) of the other actions, including one (1) in the Schafer case naming Wachovia as a defendant. Thus, no later than August 17, 2009, when the Schafer decision was rendered, a basic search of electronic media would have revealed not only the existence of the bankruptcy proceeding, but that at least nine (9) actions relating to the 90% Loan Program had been filed, including three (3) actions asserting fraud-based and breach of fiduciary claims against Wachovia similar to some of the allegations plaintiff asserts against defendants in this action. Accordingly, at the latest, inquiry notice was triggered on August 17, 2009, when a timely and reasonable inquiry would have revealed not only the fraud relating to the 90% Loan Program, but also defendants' purported role in the fraud. That plaintiff may not have learned, *inter alia*, about every fraudulent act by defendants alleged in the complaint from the previous lawsuits does not prevent a finding that he had inquiry notice of defendants' alleged participation in the fraud and breach of fiduciary duty as of August 17, 2009. See, e.g. Staehr, 547 F.3d at 434-35 (finding that the fact that the one (1) previous lawsuit against the defendant did not discuss both fraudulent schemes that were the bases of the plaintiff's complaint did not prevent the court from finding that the prior lawsuit triggered inquiry notice). Since this action was commenced more than two (2) years after plaintiff could have discovered defendants' alleged fraud, breach of fiduciary duty

---

[8] The Schafer action also named Eddy as a defendant.

and aiding and abetting breach of fiduciary duty with the exercise of reasonable diligence, plaintiff's fraud-based claims, breach of fiduciary duty claim and aiding and abetting breach of fiduciary duty claim (first through third causes of action) are time-barred.[9]

Nor is plaintiff entitled to the benefit of equitable tolling because "[r]easonable diligence is a prerequisite to the applicability of equitable tolling." Koch, 699 F.3d at 157. Since plaintiff did not pursue any timely investigation against defendants after receiving notice in 2007 that his FRNs had been sold, he did not act with reasonable diligence during the limitations period. Accordingly, the branch of defendants' motion seeking dismissal of plaintiff's fraud-based, breach of fiduciary duty and aiding and abetting breach of fiduciary claims is granted and those claims (first through third causes of action) are dismissed in their entirety as time-barred.[10]

### D. Fourth Cause of Action

Plaintiff's fourth cause of action, alleging violations of certain rules of the NYSE and NASD, fails to state a claim for relief because such rules "do not confer a private right of action." Brady v. Calyon Securities (USA), 406 F. Supp. 2d 307, 312 (S.D.N.Y. 2005); see also Weinraub

---

[9] Even assuming, *arguendo*, that the limitations period was tolled during the pendency of the FINRA Dispute Resolution arbitration, the limitations period expired prior to the commencement of this action. The two (2)-year limitations period commenced on August 18, 2009, one (1) day after plaintiff could have discovered defendants' purported role in the fraud and breach of fiduciary duty with reasonable diligence. When plaintiff commenced the FINRA Dispute Resolution arbitration on October 8, 2010, four hundred fourteen (414) days of the limitations period had expired. Thus, plaintiff only had three hundred sixteen (316) days after the FINRA Dispute Resolution award on June 28, 2011, or until May 10, 2012, within which to commence this action. Plaintiff did not commence this action until June 29, 2012, more than six (6) weeks thereafter.

[10] In light of this determination, it is unnecessary to consider the defendants' remaining contentions seeking dismissal of plaintiffs' fraud-based, breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims for failure to state a claim for relief.

v. Glen Rauch Securities, Inc., 399 F. Supp. 2d 454, 462 (S.D.N.Y. 2005), aff'd, 180 Fed. Appx. 233 (2d Cir. May 9, 2006) (holding that NYSE and NASD rules and guidelines confer no private right of action); Rozsa v. May Davis Group, Inc., 187 F. Supp. 2d 123, 129 (S.D.N.Y. 2002), aff'd sub nom Rozsa v. SG Cowen Securities Corp., 165 Fed. Appx. 892 (2d Cir. Jan. 24, 2006) (holding that a breach of NYSE rules does not provide a private right of action and that "[i]n the absence of such a private right of action, alleged breaches of regulatory rules do not form the basis for a fiduciary duty.") Accordingly, the branch of defendants' motion seeking dismissal of plaintiff's fourth cause of action is granted and plaintiff's fourth cause of action is dismissed in its entirety with prejudice

E.   Cross Motion to Amend

Although Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a party shall be given leave to amend "when justice so requires," leave to amend is not required where a proposed amendment would be futile. Hill v. Curcione, 657 F.3d 116, 123-24 (2d Cir. 2011); see also Grullon v. City of New Haven, 720 F.3d 133, 140 (2d Cir. 2013). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." Panther Partners Inc. v. Ikanos Communications, Inc., 681 F.3d 114, 119 (2d Cir. 2012). Leave to amend may also properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [and] undue prejudice to the opposing party by virtue of allowance of the amendment * * *.'" Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

Since plaintiff's first through third causes of action are time-barred, and plaintiff cannot state a claim for relief that is plausible on its face based upon defendants' purported violations of NYSE and NASD rules, any amendment to the complaint would be futile. Accordingly, plaintiff's cross motion to amend the complaint pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure is denied.

II.     CONCLUSION

For the reasons set forth above, the branches of defendants' motion seeking dismissal of plaintiff's first through third causes of action as time-barred are granted and defendant's first through third causes of action are dismissed in their entirety with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure as time-barred; the branch of defendants' motion seeking dismissal of plaintiff's fourth cause of action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and plaintiff's fourth cause of action is dismissed in its entirety with prejudice for failure to state a claim for relief; and plaintiff's cross motion seeking leave to amend his complaint pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure is denied. The Clerk of the Court shall enter judgment in favor of defendants and close this case.

SO ORDERED.                              s/ Sandra J. Feuerstein

                                         Sandra J. Feuerstein
                                         United States District Judge

Dated: August 12, 2013
       Central Islip, New York